In the

# United States Court of Appeals

### For the Seventh Circuit

No. 04-2489

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ELI SANTIAGO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 384—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 11, 2005—DECIDED NOVEMBER 3, 2005

Before POSNER, RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Eli Santiago was convicted by a jury of cocaine and firearms offenses. He claims on appeal that the prosecutor impermissibly commented on his postarrest silence in violation of the rule of *Doyle v. Ohio,* 426 U.S. 610 (1976). He also argues that his written consent to the search of his home was involuntary because it was based on an express or implied threat that his fiancée and their children would be taken into custody if contraband were found there. Finally, he challenges his sentence under *United States v. Booker,* 125 S.Ct. 738 (2005). Santiago's *Booker* claim will gain him a limited remand in accordance with *United States v. Paladino,* 401 F.3d 471, 483 (7th Cir.

2005), but we reject his other arguments and affirm the convictions.

## I. Background

Santiago was arrested following a controlled drug buy orchestrated by the Drug Enforcement Administration ("DEA"), Chicago police, and a confidential informant. On April 22, 2002, the informant attempted to purchase a kilogram of cocaine from a drug dealer named Eric Fritz. Because Fritz did not have a full kilogram immediately available, he told the informant he would have to "call this dude." Fritz then called Santiago's cell phone. After the call Fritz contacted the informant and said he "talked to the guy" and the price for the kilogram of cocaine would be $24,000.

The buy was then arranged, and Chicago police observed Santiago drive up to Fritz's house. The two men met on the sidewalk, and Santiago handed Fritz a green canvas bag. The two then went inside Fritz's home. A few minutes later, they emerged from the home, drove away in separate vehicles, and were stopped by police. Fritz took off on foot and discarded a black plastic bag during his flight. Police apprehended him and recovered the bag, which contained a kilogram of cocaine. Santiago was arrested without incident.

Police then searched Fritz's house and located the green canvas bag but no additional drugs. After issuing *Miranda* warnings to Santiago, DEA agents attempted to secure his consent to search his home. Santiago was not immediately forthcoming about where he lived, first directing the officers to his mother's home. Santiago's stepfather, Israel Figueroa, was present at Santiago's mother's home when agents arrived with Santiago. Figueroa denied that Santiago lived there but allowed the agents to search a bedroom. Figueroa testified that he

heard the agents threaten to arrest Santiago's fiancée and send their children to the Department of Children and Family Services if Santiago did not cooperate. Santiago himself testified the agents were exhorting him to "be a man," identify his residence, and consent to a search. DEA Agent James Loring denied any threats were made.

After about fifteen minutes Santiago was taken outside and agents searched the green bag, retrieving a health club contract with Santiago's fiancée's name and address on it. Confronted with this information, Santiago expressed concern that his fiancée would be implicated if contraband were found at their apartment. Santiago then consented to a search of their apartment but sought assurances that his fiancée and children would not be taken into custody. An agent agreed, writing the following on a consent-to-search form: "Any contraband found in the house does not belong to Celia Matos or the Two Children." Santiago then signed the consent; the search of Santiago's home turned up cocaine, a cocaine press and other drug paraphernalia, and two guns. After *Miranda* warnings Santiago gave a statement to Agent Loring, admitting that the drugs, drug paraphernalia, and guns belonged to him.

The district judge denied Santiago's motion to suppress the evidence obtained in the search, holding that the consent was voluntary. The judge found that Santiago had previous experience with the criminal justice system and his consent was not the result of many hours of "badgering" but, rather, was obtained within a short "15 or 20-minute time frame" and without any physical or psychological pressure. The judge found Figueroa to be "a highly credible witness" and was "prepared to believe that there was more said [to Santiago] than the [DEA] agent recalled," including something that "may have indeed made the defendant think about the consequences to his family." But the judge held that the police had handled the matter "very professionally" and that Santiago had freely negotiated with

them for an assurance "that his family would be kept out of this." The judge concluded that once the agents found the health club contract with Santiago's fiancée's address on it, Santiago knew "that there was contraband at that address, became concerned, and rightfully so, about the consequences that could result to his family," and obtained a commitment that his family would not be held responsible for any contraband found during the search. The judge found that although Santiago may have felt he had "no choice" but to consent to the search, "it wasn't because it was involuntary; it was because of the facts he created by having drugs and guns in his house."

At trial Santiago asserted a coercion defense. He testified that Fritz forced him to store the cocaine and guns for him because he defaulted on a loan. Santiago testified that he borrowed $10,000 from Fritz, at interest of $2,500 per month, but was unable to repay the money. When he asked Fritz for an extension of time, Fritz became angry, slapped him, and made him "hold" some things, including the drugs and guns. Santiago testified that Fritz also warned him that his family would get hurt if anything happened to Fritz's things.

On cross-examination the prosecutor questioned Santiago about the fact that he had not mentioned Fritz's threats in his custodial statement:

> Q: And you didn't take that opportunity to tell Agent Loring "I've been threatened by Eric Fritz," correct?
>
> A: No. . . .
>
> . . . .
>
> Q: And you did not tell him—
>
> A: No, I didn't.
>
> Q: —that Eric Fritz was threatening you, correct?
>
> A: Correct.

. . . .

Q: And when you had this moment where you were not afraid of Fritz, you didn't say anything to the agents about being threatened, right?

A: No, I did not.

Q: So in this interview, you say you talked about Fritz. You said it was Fritz's, right?

A: I told him it was Fritz's.

Q: You didn't say "Fritz threatened me"?

A: Well, I never got asked that question.

. . . .

Q: But you did not tell Agent Loring that Fritz was threatening you, right?

A: No, I did not.

During closing argument, the prosecutor referred to Santiago's failure to mention the alleged coercion in his statement to police: "There were plenty of opportunities to tell . . . law enforcement that he was being coerced. But the coercion never happened." This point was reiterated several times during the government's closing argument.

The jury convicted Santiago of the five counts charged in the indictment: conspiracy to possess cocaine with intent to distribute, two counts of possession of cocaine with intent to distribute, possession of a firearm in relation to drug trafficking, and possession of a firearm by a felon. At sentencing the district judge applied the Sentencing Guidelines under the mandatory pre-*Booker* framework, imposing a sentence of 110 months on each of the drug offenses and one of the firearm offenses, to run concurrently, and a mandatory five-year consecutive sentence for possession of a firearm in furtherance of a drug trafficking offense pursuant to 18 U.S.C. § 924(c)(1)(A).

## II. Discussion

### A. Due Process

Santiago first argues that the prosecutor impermissibly commented on his postarrest silence when cross-examining him and during closing argument, in violation of the rule of *Doyle*. Because Santiago did not object below, our review is for plain error. *United States v. Chavez*, 193 F.3d 375, 376 (5th Cir. 1999); *Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir. 1997).

The Supreme Court held in *Doyle* that due process prohibits the government's use of a defendant's postarrest, post-*Miranda* silence for impeachment purposes. *Doyle*, 426 U.S. at 619. The defendants in *Doyle* did not make any statements to police following *Miranda* warnings; they then testified at trial that they were framed, and the prosecutor cross-examined them on their failure to mention the frame-up to the police after they were arrested. This line of questioning, the Court concluded, was constitutionally impermissible because a defendant who invokes his right to remain silent following *Miranda* warnings has been implicitly assured that his silence will not be used against him. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618.

The Court revisited this issue in *Anderson v. Charles,* 447 U.S. 404 (1980). There, after receiving *Miranda* warnings, the defendant told the arresting officer he had stolen a car from a particular location, but at trial changed his story and said the car was stolen from another spot. On cross-examination the prosecutor asked the defendant whether he thought it was "rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?" *Id.* at 406. The Supreme Court distinguished *Doyle*, holding that its rationale "does

not apply to cross-examination that merely inquires into prior inconsistent statements" because "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* at 408.

This circuit has interpreted *Doyle* and *Anderson* to allow prosecutors to demonstrate an "arguable inconsistency" between a defendant's postarrest statements and his testimony. *Smith v. Cadagin*, 902 F.2d 553, 558-59 (7th Cir. 1990). Determining whether such an inconsistency exists requires drawing "a fine line between impeachment by showing a curious incompleteness in a suspect's story and impeachment from silence." *Smith,* 902 F.2d at 557 (quoting *Phelps v. Duckworth*, 772 F.2d 1410, 1421 (7th Cir. 1985) (en banc) (Easterbrook, J., concurring)).

*Smith* involved a state conviction in which the defendant testified that his actions against the victim were just a "practical joke." *Id.* at 554-55. During cross-examination, the prosecutor twice noted the defendant had never before described his actions as a "practical joke"; instead, following arrest, the defendant told the police things had gotten "out of hand." *Id.* at 554. Although saying a situation has gotten "out of hand" is not *always* inconsistent with saying it was a practical joke, we held the prosecutor's line of questioning was permissible because it was "an attempt to demonstrate an 'arguable inconsistency' in the defendant's account" rather than a forbidden "attempt to exploit the defendant's silence." *Id.* at 559.

As in *Smith*, we find no *Doyle* due process violation here. Santiago did not invoke his right to remain silent following *Miranda* warnings, but gave a full inculpatory statement to the police and then testified differently at trial. The prosecutor was not exploiting Santiago's silence but, rather, was probing the arguable inconsistency between the story Santiago initially told to the police and the testimony he

gave at trial. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson*, 447 U.S. at 408.

### B.  Consent to Search

Santiago also attacks the district court's denial of his suppression motion. He argues he was under duress when he consented to the search of his home because the police threatened to arrest his fiancée and have his children sent to protective custody.

The voluntariness of a defendant's consent to a search is a factual finding reviewed for clear error. *United States v. Raibley*, 243 F.3d 1069, 1076 (7th Cir. 2001). The voluntariness inquiry turns on several factors, including: "(1) the person's age, intelligence, and education[;] (2) whether he was advised of his constitutional rights[;] (3) how long he was detained before he gave his consent[;] (4) whether his consent was immediate, or was prompted by repeated requests by the authorities[;] (5) whether any physical coercion was used[;] and (6) whether the individual was in police custody when he gave his consent." *Id.* at 1075-76.

Santiago attempts to analogize his case to *United States v. Ivy*, 165 F.3d 397, 402-04 (6th Cir. 1998), but the facts of that case, while superficially similar in some respects, reveal egregious police conduct not in evidence here. In *Ivy,* the police arrived at the defendant's home looking for a fugitive; the suspect they sought was not there, but one of the occupants of the home fled, was chased, and was found to be in possession of cocaine. The police then requested Ivy's consent to search the home, which was refused. Ivy's girlfriend and their infant child were also present, and the girlfriend also refused consent to search. The police

handcuffed her leg to a table and periodically took the baby away from her, while telling Ivy to "be a man" and consent to the search or they would arrest her and take the baby into protective custody. This went on for an hour and a half before Ivy relented and consented to the search. *Id.* at 402. The Sixth Circuit concluded:

> After an hour and a half of this situation—of police threats to arrest [the girlfriend] and take the child, of [the girlfriend] being shackled to a table, of the child being taken from his mother's arms, of repeated police solicitations for consent—Ivy finally acquiesced and signed the consent to search form. . . . One thing is certain: Ivy's consent was not voluntarily imparted; his will was indeed overcome.

*Id.* at 404.

This case differs from *Ivy* in several crucial respects, not the least of which is the absence of any explicit finding of a threat by the police. Contrary to Santiago's characterization of the record, the district judge did not actually find that the agents had threatened to arrest Santiago's fiancée and have their children taken into protective custody. At most, the judge found that "more was said than the agent recalled," which "may have indeed made the defendant think about the consequences to his family." But the judge also stated what he thought "really . . . happened here": the agents, by searching Santiago's gym bag, finally learned his true address, and at that point Santiago realized a search of his home likely would occur with or without his consent. He then "became concerned, and rightfully so, about the consequences that could result to his family," including, the judge found, that the police "could in fact draw a conclusion that his girlfriend had something to do with" the contraband Santiago knew they would find when they went to his home. So he negotiated a commitment that "his family [would] be kept out of this" in exchange for his consent to search.

The district court concluded that Santiago's "rightful concern" for his family did not amount to "psychological pressure." The district court also found that the police behaved "very professionally" and that the entire incident took no more than fifteen or twenty minutes and was devoid of any badgering or harassment. Under these circumstances any analogy to *Ivy* is inapt. The district court's voluntariness finding was not clearly erroneous.

## C. Sentencing

In imposing Santiago's sentence, the district court treated the Sentencing Guidelines as mandatory, in violation of what by now is the well-known holding in *Booker* that the Guidelines are to be deemed advisory. *Booker,* 125 S.Ct. at 764. Santiago did not object below, so our review is for plain error. Following the procedure established in *Paladino,* 401 F.3d at 483, a limited remand is in order so the district judge may tell us whether Santiago's sentence would have been different had the Guidelines been applied as advisory rather than mandatory.

Accordingly, the convictions are AFFIRMED; we retain jurisdiction and order a limited REMAND pursuant to *Paladino.*

A true Copy:

      Teste:

*Clerk of the United States Court of
Appeals for the Seventh Circuit*