In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1598

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN THURMAN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cr-00366-1 — **Virginia M. Kendall**, *Judge.*

_____

ARGUED NOVEMBER 29, 2017 — DECIDED MAY 2, 2018

_____

Before WOOD, *Chief Judge*, RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Law enforcement executed a search warrant at Brian Thurman's residence after a cooperating informant purchased heroin inside. They discovered drug paraphernalia, two handguns, and a large amount of money. Mr. Thurman was arrested and later charged in a three-count superseding indictment with (1) maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); (2) distributing

100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1); and (3) possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Before trial, Mr. Thurman filed two motions to suppress: one to exclude self-incriminating statements that he made following his arrest and another to exclude evidence obtained from a search of his cell phone. The district court denied both motions. A jury later convicted Mr. Thurman on the distribution charge, but acquitted him on the drug-premise and firearms charges. The court sentenced him to seventy-two months' imprisonment and four years' supervised release.

Mr. Thurman now challenges the court's denial of his motions to suppress and its findings supporting his sentence. He maintains that he did not waive voluntarily his *Miranda* rights or consent voluntarily to the search of his cell phone. He also challenges the court's findings at sentencing that he was responsible for at least 700 grams of heroin and that he possessed a dangerous weapon. He notes that the jury convicted him of distributing a significantly smaller quantity of drugs and acquitted him of the firearms charge.

We cannot accept these contentions. Mr. Thurman's suppression arguments require us to re-evaluate the district court's credibility determinations. The court did not clearly err in crediting the officers' testimony that Mr. Thurman consented to their questioning and to the search of his phone. Furthermore, the court made proper findings of fact when applying the Sentencing Guidelines. Sentencing courts can consider conduct underlying an acquitted charge so long as that conduct is proven by a preponderance of the evidence. Accordingly, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

In August 2013, Minnesota police officers tracked the movement of Courtney Williams from the west side of Chicago to Minnesota, where they arrested him with 489 grams of heroin hidden inside a spare tire. Williams told the authorities that Mr. Thurman had supplied him with the heroin in exchange for a $17,000 down payment and $20,000 of debt. Later that month, in cooperation with the police, Williams wore a wire to Mr. Thurman's house in Chicago, where he gave Mr. Thurman $10,000 in partial payment of his debt. Williams continued to cooperate with authorities and arranged a controlled drug purchase the next month. Williams sent Mr. Thurman a text message with the number "150," to which Mr. Thurman wrote "Yeap" and later responded with "Touchdown."[1] The next day, Williams went to Mr. Thurman's house and exchanged $23,500 for 148.5 grams of heroin and the satisfaction of his remaining debt. Law enforcement waited outside while Williams completed the transaction.

After confirming that Williams had purchased heroin inside, the officers forced entry into Mr. Thurman's house and executed a search warrant that was contingent on the completion of the controlled buy. They arrested Mr. Thurman and handcuffed him in the back of a police car. His girlfriend and son remained inside. While searching the basement, the officers found plastic bags, packaging tape, electronic scales, a safe with approximately $27,000 in cash, and some of the money

---

[1] R.137 (Trial Tr.) at 332, 336.

Williams had just exchanged. They did not discover any her-
oin. Mr. Thurman informed the police that there were two
firearms in the house: a Glock .40 caliber handgun in a trash
bag in the basement and a Bryco .380 caliber handgun in a
bedroom closet upstairs. The officers discovered loaded mag-
azines next to both guns; however, they could not recall con-
sistently whether the guns themselves were loaded. When
asked, Mr. Thurman told the officers that they could search
the common areas of a nearby residential property which he
owned. He refused, however, to sign a consent form and spe-
cifically instructed the officers not to search inside the apart-
ments where his tenants lived. An officer wrote "refused to
sign but consented" on the consent form.[2]

Law enforcement took Mr. Thurman to a Chicago office of
the Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF") for questioning. Once inside the interview room, the
agents removed Mr. Thurman's handcuffs and provided him
with a Gatorade. According to the authorities, they advised
Mr. Thurman of his *Miranda* rights, but he refused to sign an
advice-of-rights form. Nevertheless, he indicated a desire to
cooperate with them and proceeded to admit that he had sold
drugs out of his house and owned two guns to protect his
drug trade. During the interview, the agents conducted a
search of Mr. Thurman's cell phone. The parties dispute
whether Mr. Thurman verbally consented to this search, but
they agree that he refused to sign a consent-to-search form.
Two of the agents remembered Mr. Thurman showing them
specific names and numbers in the phone corresponding to

---

[2] R.52 (Suppression Hr'g Tr.) at 52.

Williams, who was listed as "Skinny," and his primary supplier, who was listed as "Meko."[3] They also recalled Mr. Thurman admitting to having deleted text messages with Williams about their transaction earlier that day.

The agents eventually released Mr. Thurman on the understanding that he would return the next day to continue cooperating. They retained his cell phone and expected him to initiate recorded calls with his supplier when he returned. Mr. Thurman asked whether he should bring an attorney with him, and the agents said that it was his choice. Mr. Thurman did not return as expected. Instead, his attorney called to say that Mr. Thurman would not be cooperating any further. Law enforcement subsequently conducted a forensic examination of his cell phone and reconstructed the recently deleted text messages between Mr. Thurman and Williams.

## B.

In September 2015, Mr. Thurman was charged in a three-count superseding indictment with (1) knowingly using and maintaining a residence for the purpose of distributing a controlled substance, in violation of 21 U.S.C. § 856(a)(1); (2) knowingly and intentionally distributing 100 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1); and (3) knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

---

[3] R.137 (Trial Tr.) at 412–16.

Before trial, he filed a motion to suppress any evidence obtained from the search of his cell phone and a motion to suppress any incriminating statements he made during the post-arrest interrogation.[4] He attached copies of the consent-to-search form for his cell phone and the advice-of-rights form, both of which reflected his refusal to sign. He also submitted an affidavit averring that he "refused to give consent to the requested warrantless searches" and "refused to provide any information to law enforcement agents without the presence of an attorney."[5]

The district court held a hearing on the motions. At the hearing, the Government presented substantially consistent testimony from three of the agents involved in Mr. Thurman's arrest and questioning. They all testified that Mr. Thurman refused to sign any forms but verbally agreed to the limited search of his second property, to the search of his cell phone, and to their questioning without an attorney present. The agents did not record their interactions with Mr. Thurman.[6] The defense called two law enforcement witnesses. They provided substantially similar testimony to that of the prosecution's witnesses. Mr. Thurman did not testify at the hearing, instead relying on his affidavit.

---

[4] Mr. Thurman did not challenge the search of his second property, as nothing was found or removed from those premises.

[5] R.45-2; R.46-2.

[6] At the time, ATF policy did not require video recording of all custodial interrogations. Since Mr. Thurman's arrest, the policy has been changed to require such recordings.

The court denied both motions. With respect to the motion to suppress the incriminating statements, the court concluded that Mr. Thurman did not unambiguously invoke his *Miranda* rights but rather impliedly waived them. The court credited the testimony of the agents, whom it deemed "credible based on their demeanor and the consistency of their testimony."[7] Accordingly, the court found that Mr. Thurman had spoken freely during the interview with a full understanding of his rights and in an apparent attempt to obtain beneficial treatment. It also held that Mr. Thurman's refusal to sign the advice-of-rights form did not undermine the voluntariness of his waiver; if anything, it demonstrated his comfort in denying the agents' requests. With respect to the motion to suppress the evidence from the cell phone search, the court found that Mr. Thurman voluntarily consented to the search, as demonstrated by his clear understanding of his rights and comfort interacting with the authorities. With all of this evidence deemed admissible, the case proceeded to trial.

At trial, the Government presented similar testimony from the agents as well as testimony from Williams. It also introduced recordings of Williams's meetings with Mr. Thurman, the drug paraphernalia and handguns seized from Mr. Thurman's residence, Mr. Thurman's incriminating statements following his arrest, telephone records and summaries, and reconstructed text messages and contacts that had been deleted from his cell phone. Mr. Thurman did not testify. The jury convicted him on the distribution charge (Count 2), but acquitted him on the drug-premises charge (Count 1) and the firearms charge (Count 3).

---

[7] R.73 at 9.

At sentencing, the court found that Mr. Thurman was responsible for distributing between 700 grams and one kilogram of heroin, resulting in a base offense level of 28. *See* U.S.S.G. § 2D1.1(c)(6). It also found that he possessed a dangerous weapon in connection with the drug offense, which triggered a two-level enhancement. *See* U.S.S.G. § 2D1.1(b)(1). Combining his offense level of 30 with his criminal history category of I, the court calculated an advisory guidelines range of 97 to 121 months. The court then considered the sentencing factors under 18 U.S.C. § 3553(a). It weighed the seriousness of the offense and the need for general deterrence against Mr. Thurman's positive history and characteristics; specifically, he had contributed to his community as a teacher and demonstrated both a sense of remorse and an ability to reform his behavior. Ultimately, the court sentenced him to seventy-two months in prison and four years of supervised release. It further ordered him to repay the money he retained from the controlled buy and to pay a special assessment of $100.

## II

## DISCUSSION

### A. Motions to Suppress

Mr. Thurman challenges the district court's denials of his motions to suppress. We review the court's legal conclusions de novo and its underlying factual findings for clear error, giving special deference to its credibility determinations. *See United States v. Burnside*, 588 F.3d 511, 516–17 (7th Cir. 2009). "A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a definite and

firm conviction that a mistake has been made." *Id.* at 517 (internal quotation marks omitted).

## 1.

We first consider Mr. Thurman's motion to suppress his post-arrest statements. The district court found that Mr. Thurman did not unambiguously invoke his *Miranda* rights but rather impliedly waived them. This conclusion primarily turned on the court's crediting of the agents' testimony and discrediting of Mr. Thurman's affidavit. According to the court's factual findings, Mr. Thurman was advised of and fully understood his *Miranda* rights; he strategically refused to sign the advice-of-rights form; and he nonetheless chose to speak with the officers in the hope of obtaining leniency. The court did not find any credible evidence that Mr. Thurman invoked his *Miranda* rights or was coerced into waiving them. It thus denied his motion to suppress.

The law is clear that before law enforcement officers can interrogate a suspect in custody, they must inform the suspect of his *Miranda* rights. *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009). If the suspect invokes his rights, the officers must cease their questioning. *Id.* However, the burden is on the suspect to make a "clear and unambiguous assertion" of his rights. *Id.* (quoting *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005)). Even if a suspect does not invoke his *Miranda* rights, his self-incriminating statements cannot be used against him in court unless the Government shows by a preponderance of the evidence that he voluntarily waived these rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382–84 (2010); *see also United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2011).

The voluntariness of a waiver is assessed based on the totality of circumstances. *Brown*, 664 F.3d at 1118.

The record adequately supports the district court's finding that Mr. Thurman did not invoke his *Miranda* rights. This finding was based primarily on the court's evaluation of the credibility of the agents compared to that of Mr. Thurman. As is often the case with motions to suppress, the court was faced with "a veritable '[]he said' versus 'they said,'" *United States v. Smith*, 218 F.3d 777, 780 (7th Cir. 2000), and it accepted the agents' version of events. Notably, the court was able to assess firsthand the agents' demeanors under cross-examination, whereas it could not probe Mr. Thurman's uncorroborated affidavit. Because the agents' testimony was consistent, plausible, and unbiased, we see no clear error in the court's credibility determinations. Mr. Thurman's later inquiry about getting an attorney does not undermine the finding that he failed to invoke his rights; his inquiry occurred after the end of the interrogation, and, in any event, it was not an unambiguous invocation of his *Miranda* rights. *See Shabaz*, 579 F.3d at 819 (noting that the statements, "maybe I should talk to a lawyer" and "I don't know if I need an attorney," do not invoke the right to counsel). Based on the record as it comes to us, we must uphold the finding that Mr. Thurman did not invoke his *Miranda* rights.

We next review whether Mr. Thurman waived his rights and, if so, whether his waiver was voluntary. Waiver can be express or implied. *Berghuis*, 560 U.S. at 384. In the latter case, waiver "may be inferred from a defendant's understanding of [his] rights coupled with a course of conduct reflecting [his] desire to give up [these] right[s]." *Smith*, 218 F.3d at 781. The burden is on the prosecution to show that the defendant gave

up his rights "voluntar[il]y in the sense that it was the product of a free and deliberate choice … and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 382–83 (internal quotation marks omitted). The voluntariness of waiver is informed by the defendant's age and education, his experience with law enforcement, and the length and conditions of the interview. *Brown*, 664 F.3d at 1118; *Shabaz*, 579 F.3d at 820.

Mr. Thurman maintains that his refusal to sign the advice-of-rights form shows that he did not waive his rights, at least not voluntarily. Refusal to sign a waiver form, however, is not enough to defeat credible evidence of an implied waiver. *See Smith*, 218 F.3d at 781 ("[W]aiver may be inferred from the defendant's conduct, even when [he] has refused to sign a waiver form."); *see also Shabaz*, 579 F.3d at 820. As the Supreme Court has explained, "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385. Here, the record provides more than sufficient support for the finding that Mr. Thurman understood his rights and deliberately chose to relinquish them by engaging in the interrogation.

The circumstances of his interview and his particular conduct closely resemble prior cases in which we have affirmed the voluntariness of defendants' waivers. In *Smith*, we rejected the defendant's argument that her refusal to sign a waiver form required the suppression of her incriminating statements. *See* 218 F.3d at 781. We concluded that she voluntarily waived her *Miranda* rights based in part on the fact that

the authorities brought her a beverage and created an atmosphere that the district court described as "low key and informal." *Id.* Similarly, the officers here brought Mr. Thurman a Gatorade, released him from handcuffs, and "acted professionally during all of their interactions with Thurman."[8] Our conclusion in *Smith* was bolstered by "the fact that [the defendant] refused to sign the waiver form," which "show[ed] her independent thinking and exercise of her free will." *Id.* at 782. The same reasoning applies here. Any pressure that Mr. Thurman felt simply did not rise to the level of coercion that renders a waiver involuntary. *See Berghuis*, 560 U.S. at 387 (rejecting claim of involuntary waiver and noting that defendant was not "incapacitated and sedated," "sleep and food depriv[ed]," or threatened).

For all of the reasons above, we affirm the court's denial of Mr. Thurman's motion to suppress his post-arrest statements.

## 2.

Mr. Thurman also challenges the denial of his motion to suppress evidence resulting from the authorities' search of his cell phone. He again points to his affidavit and his refusal to sign a consent form as evidence that he did not consent, at least not voluntarily, to the search of his phone. He also argues in the alternative that his consent was limited to the search of his phone during the interrogation and did not extend to the subsequent forensic examination. Therefore, he

---

[8] R.73 at 11.

claims, the reconstructed text messages and contacts should not have been admitted at trial.

There is no dispute that "[w]arrantless searches are presumptively unreasonable under the Fourth Amendment." *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). Therefore, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). One such exception is voluntary consent to a search. *See Strache*, 202 F.3d at 984. If the Government relies on this exception, it must prove by a preponderance of the evidence that the defendant consented to the disputed search. *See United States v. Hicks* (*Hicks II*), 650 F.3d 1058, 1064 (7th Cir. 2011).

Here, the question whether Mr. Thurman consented to the search raises an underlying question: did the officers lie when they testified at the suppression hearing, or did Mr. Thurman lie in his affidavit? This is a classic credibility determination. As such, we "defer to the district court's determination … because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'" *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (quoting *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)). Here, the court was faced with two divergent accounts, neither of which was facially implausible. The court weighed the credibility of Mr. Thurman's affidavit against the live testimony of the agents. Although only two agents were present when Mr. Thurman was asked to sign the consent-to-search form, they consistently recalled his refusal to sign, his verbal consent to the search, and his affirmative help in identifying particular names and numbers in his phone. Their testimony was

not implausible or otherwise disqualifying, and it provided an adequate basis for the court's determination.[9]

Before addressing the voluntariness and scope of Mr. Thurman's consent, we address two of his arguments that the agents' testimony should not be believed. First, he claims that his refusal to sign the consent form constitutes objective documentary evidence that cannot be disproven by supposedly self-serving testimony. Mr. Thurman's argument overlooks the fact that the agents' testimony does not contradict the documentary evidence: they recalled his refusal to sign the forms *as well as* his separate verbal consent.[10] Furthermore, Mr. Thurman cites no authority for the proposition that documentary evidence necessarily outweighs verbal testimony. To the contrary, we, as well as other courts, have affirmed findings of consent despite a defendant's documented refusal

---

[9] Mr. Thurman emphasizes the Supreme Court's opinion in *Riley v. California*, 134 S. Ct. 2473 (2014). There, the Court held that cell phone data generally cannot be searched without a warrant under the search incident to arrest exception. *Id.* at 2495. Although the Court discussed the unique nature of modern cell phones as unparalleled repositories for personal information, it did not address the consent-based exception to the warrant requirement. Indeed, the Court stated that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494. Therefore, *Riley* does not affect our holding.

[10] The agents remembered a similar response by Mr. Thurman when they asked if they could search his second residential property. According to the agents, he refused to sign the consent form but said "I know my rights. I can give you verbal consent, and I'm doing that." R.52 (Suppression Hr'g Tr.) at 76.

to sign a form.[11] Second, Mr. Thurman highlights the lack of any recording of his consent, which contravenes the ATF's current policy of recording all custodial interrogations. Although a recording would resolve the present dispute, the Constitution certainly does not mandate such a policy. *See United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004). The ATF's decision to enact more protective practices does not render the agents' past actions unlawful or their testimony implausible. *Cf. Biggs*, 491 F.3d at 621–22 (upholding finding of consent despite lack of recording).

Arguing in the alternative, Mr. Thurman contends that his consent was not given voluntarily. The Fourth Amendment requires that "consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). When a defendant claims that he was coerced into consenting, the Government bears the burden of proving otherwise by a preponderance of the evidence. *See Hicks II*, 650 F.3d at 1064. The voluntariness of

---

[11] *See, e.g.*, *United States v. Hicks* (*Hicks I*), 539 F.3d 566, 568–70 (7th Cir. 2008) (affirming finding of oral consent despite refusal to sign consent statement); *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (en banc) ("It is clear, however, that a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent."); *United States v. Thompson*, 876 F.2d 1381, 1384 (8th Cir. 1989) (holding consent effective despite defendant's refusal to sign written consent form); *United States v. Castillo*, 866 F.2d 1071, 1081–82 (9th Cir. 1988) (holding that refusal to execute written consent form did not vitiate prior verbal consent); *United States v. Boukater*, 409 F.2d 537, 538 (5th Cir. 1969) (noting that refusal to sign waiver did not taint search to which defendant otherwise consented); *cf. United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820–21 (7th Cir. 2013) (rejecting claim that verbal consent was revoked by writing "UNDER PROTEST" on consent form).

consent is a question of fact informed by the totality of circumstances. *Schneckloth*, 412 U.S. at 227. We have enumerated the following relevant factors: (1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented. *United States v. Hicks* (*Hicks I*), 539 F.3d 566, 570 (7th Cir. 2008).

When viewed as a whole, the record adequately supports the finding that Mr. Thurman's consent was voluntary. By all accounts, Mr. Thurman is an intelligent and educated person. He graduated from Purdue University and was pursuing a master's degree at the time of his arrest. He was advised of his constitutional rights and consented to the search without repeated prompting. Additionally, there are no indications that physical coercion was used to obtain his consent. Although Mr. Thurman was in custody, his handcuffs were removed and he was given a Gatorade. The fact that he limited his consent to an earlier search and refused to sign the consent form further demonstrates that he was comfortable partially granting, and even denying, the officers' requests.

Mr. Thurman's last challenge to the search concerns the scope of his consent. Even if his consent was freely given, he claims, it did not extend to the secondary forensic search of his phone.[12] Based on the record before us, we cannot agree.

---

[12] The Government contends that Mr. Thurman has waived this challenge by failing to raise it before the district court and failing to provide good

It is well established that a criminal suspect may limit the scope of consent to a search, *see Florida v. Jimeno*, 500 U.S. 248, 252 (1991), but the burden is on him to do so, *see United States v. Patterson*, 97 F.3d 192, 195 (7th Cir. 1996). Whether a search extends beyond the scope of consent "is a question of fact to be determined from the totality of all the circumstances." *United States v. Saucedo*, 688 F.3d 863, 865 (7th Cir. 2012) (quoting *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010)). The standard for measuring the scope of consent "is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. Relevant factors include the defendant's behavior, the purpose of the search, and any show of force. *United States v. Osuorji*, 32 F.3d 1186, 1190 n.3 (7th Cir. 1994).

Mr. Thurman's actions and the circumstances of the investigation adequately support a finding that he consented to the forensic examination. "[C]ourts can look at the defendant's conduct to help determine the scope of a consensual search." *United States v. Maldonado*, 38 F.3d 936, 940 (7th Cir. 1994). When the agents asked if they could search Mr. Thurman's phone, they presented him with the same consent form that he had refused to sign earlier with respect to the search of his second residential property. Despite his refusal to sign,

---

cause for that omission. *See* Fed. R. Crim. P. 12(b)(3)(C) (providing that a motion to suppress must be raised before trial). Mr. Thurman insists that his claim of non-consent encompasses his challenge to the scope of consent. Because we conclude that Mr. Thurman's consent extended to the forensic search, we need not decide whether Mr. Thurman waived or forfeited this argument. His challenge fails under any standard of review.

Mr. Thurman not only verbally agreed to the search, he af-firmatively showed the agents specific names and phone numbers corresponding to his drug-related contacts. This conduct does not suggest any intent to limit the parameters of his consent. *See United States v. Jackson*, 598 F.3d 340, 348–49 (7th Cir. 2010) ("Where someone … consents to a general search, law enforcement may search anywhere within the general area where the sought-after item could be con-cealed."); *United States v. Long*, 425 F.3d 482, 486–87 (7th Cir. 2005) (holding that forensic search of computer did not exceed scope of consent to search defendant's office, including his computer, when consent was given "with no limitations or qualifications"). Mr. Thurman did not restrict the agents' con-temporaneous examination of his phone, nor did he ask for it back at the end of the interview. The unlimited nature of his consent is particularly apparent when considered in light of his earlier limited consent to the search of his second prop-erty.

Furthermore, the purpose of the search was clear. As the Supreme Court has explained, the "scope of a search is gener-ally defined by its expressed object." *Jimeno*, 500 U.S. at 251. Because it was clear that the agents were investigating Mr. Thurman's recent drug sales, a reasonable person in his position would expect them to search the phone for relevant deleted messages.[13] A reasonable person may be expected to

---

[13] We note parenthetically that during trial the officers testified that they asked Mr. Thurman about his recent transaction with Williams, and Mr. Thurman admitted that he had erased his text messages arranging that sale. The agents did not attempt to mislead Mr. Thurman or otherwise obfuscate the purpose of their investigation. *See United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010) ("Law enforcement agents may not obtain

know that recently deleted information can be reconstructed on a cell phone. *Cf. United States v. Watkins*, 760 F.3d 1271, 1277, 1283 (11th Cir. 2014) (concluding that unlimited consent to search computer extended to forensic search that revealed deleted files); *Long*, 425 F.3d at 486–87 (holding that unlimited consent to search office and laptop authorized forensic search of computer). Given the clear purpose of the search and the unlimited nature of Mr. Thurman's consent, we conclude that the forensic examination did not violate his Fourth Amendment rights.[14] We thus affirm the denial of the motion to suppress.

someone's consent to search by misrepresenting that they intend to look only for certain specified items and subsequently use that consent to justify a general exploratory search.").

[14] Mr. Thurman cites *United States v. Escamilla*, 852 F.3d 474 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 336 (2017), for the proposition that "[w]hen the facts and circumstances surrounding a person's consent suggest a natural end to the consensual exchange with law enforcement, officers should not view the earlier consent as 'authorizing a second search at some future time if the first search is not fruitful.'" Appellant's Br. 20 (quoting *Escamilla*, 852 F.3d at 485). In *Escamilla*, the Fifth Circuit held that a forensic search of the defendant's cell phone was not justified by his earlier consent to a request to "look through" it. 852 F.3d at 485. Although we are not bound by *Escamilla*, we note that Mr. Thurman's case is distinguishable on multiple grounds. For one, the officer in *Escamilla* returned the phone to the defendant, indicating the end of the search to which he had consented. Here, Mr. Thurman's phone was not returned at the end of the interview, and he does not appear to have requested its return even after he ceased cooperating. Furthermore, unlike the defendant in *Escamilla*, Mr. Thurman told the authorities that he had deleted information from his phone that he reasonably should have known was highly relevant to their investigation. When the defendant consented in *Escamilla*, he did not know the nature of the officer's investigation, nor did he admit to the removal of relevant information from his phone.

**B. Sentencing**

Mr. Thurman also challenges the district court's findings underlying its application of the Sentencing Guidelines. The court set Mr. Thurman's base offense level at 28 based on a finding that he was responsible for between 700 grams and one kilogram of heroin. *See* U.S.S.G. § 2D1.1(c)(6). It also applied a two-level enhancement after finding that he possessed a dangerous weapon in connection with the drug offense. *See* U.S.S.G. § 2D1.1(b)(1). Mr. Thurman contends that these determinations violate his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury, respectively. We review the court's application of the Guidelines de novo and its factual findings for clear error. *United States v. Cherry*, 855 F.3d 813, 815–16 (7th Cir. 2017).

**1.**

Mr. Thurman first attacks the court's drug-quantity finding. Although the jury convicted him of distributing only 100 grams or more of heroin, the court selected his base offense level based on 700 grams to one kilogram of heroin. The court arrived at that figure by considering the amount of heroin seized from Williams in August 2013, the amount of heroin Williams purchased in the controlled buy, the amount of money and drug paraphernalia found in Mr. Thurman's basement, and Mr. Thurman's own admission that he sold approximately 800 grams to Williams over a three-month period. The court declined to consider Williams's statement to the grand jury that he had obtained an additional 1.15 kilograms from Mr. Thurman between the spring of 2012 and August 2013.

The standards that apply to drug-quantity findings at sentencing are well established:

> [A] preponderance of the evidence is all that is required for a factual finding of drug quantity under the Sentencing Guidelines, due process concerns notwithstanding. Determining drug quantities under the Sentencing Guidelines is often difficult, and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability. … At the same time, … a district court choosing among plausible estimates of drug quantity should normally err on the side of caution.

*United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015) (citations omitted) (internal quotation marks omitted). Accordingly, the fact that the jury did not find beyond a reasonable doubt that Mr. Thurman distributed at least 700 grams of heroin does not undermine the constitutionality of the court's chosen base offense level. *See United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007) (noting that sentencing courts are "not bound by the same stringent evidentiary standards as are applicable in a criminal trial"). So long as the evidence before the court "bears sufficient indicia of reliability to support its probable accuracy," we will not disturb its findings. *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007) (alterations omitted) (quoting *United States v. Cross*, 430 F.3d 406, 410 (7th Cir. 2005)).

After a careful review of the record, we conclude that there was more than sufficient evidence to support the court's drug-quantity finding. When Williams first was arrested in August 2013, the police seized 498 grams of heroin from his

spare tire, which he attributed to a recent purchase from Mr. Thurman. This attribution was corroborated by the officers' surveillance records, which placed Williams near Mr. Thurman's house the day before. The $27,000 found in a safe in Mr. Thurman's basement, along with packaging tape, plastic baggies, and electronic scales, also demonstrates the scale of his drug operation.

Moreover, Mr. Thurman admitted to authorities that he had distributed approximately 800 grams of heroin to Williams over a three-month period. "Self-incriminating statements … clearly against [a defendant's] penal interest, have long been considered reliable enough for use at trial, so we cannot say that they are too unreliable for use at sentencing." *United States v. Tankson*, 836 F.3d 873, 882 (7th Cir. 2016) (alterations omitted) (quoting *United States v. Johnson*, 342 F.3d 731, 734 (7th Cir. 2003)). Mr. Thurman's admission is particularly reliable given that the 800-gram amount he quoted reasonably corresponds to the amount found in Williams's tire plus the amount of the controlled buy. As we have said, "no one [is] more qualified than the dealer himself to put a number on the amounts of [drugs] he was purchasing and reselling." *Id.* (alterations omitted) (quoting *Johnson*, 342 F.3d at 734). Together, this evidence provides more than a sufficient basis for the court's finding.

We cannot accept Mr. Thurman's contention that the court's reliance on Williams's testimony violated his "due process right to be sentenced on the basis of accurate information." *Bozovich*, 782 F.3d at 817 (quoting *Ben-Yisrayl v. Buss*, 540 F.3d 542, 554 (7th Cir. 2008)). He emphasizes that Williams has a prior conviction for giving false testimony to police and was motivated to curry favor with the authorities for

his own benefit. However, "a sentencing judge is free to credit testimony that is 'totally uncorroborated,' 'comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant,' or 'self-interested co-conspirator.'" *United States v. Isom*, 635 F.3d 904, 908 (7th Cir. 2011) (alterations omitted) (quoting *Johnson*, 489 F.3d at 797). We therefore cannot say that the district court was clearly erroneous in crediting Williams's testimony when it was corroborated by surveillance records and by Mr. Thurman's own admission. Notably, the court declined to increase the drug quantity based on Williams's uncorroborated testimony to the grand jury. This selectivity shows that the court was adequately skeptical of Williams's claims and relied on only information with sufficient indicia of reliability. We do not see any error, let alone clear error, in the drug-quantity finding. Thus, the court properly applied U.S.S.G. § 2D1.1(c)(6)[15] to calculate Mr. Thurman's base offense level.

### 2.

Mr. Thurman's challenge to the firearms enhancement fares no better. He contends that the district court erred in applying an enhancement for possession of a dangerous weapon given the jury's previous acquittal on the firearms charge. Despite the jury's acquittal, the court found that Mr. Thurman was in constructive possession of two firearms in connection with the drug offense. Both handguns were

---

[15] Section 2D1.1(c) contains the Drug Quantity Table, which sets forth a base offense level of 28 for "[a]t least 700 G but less than 1 KG of Heroin." U.S.S.G. § 2D1.1(c)(6).

found during the execution of the search warrant. A .40 caliber Glock was enclosed in a box in a trash bag filled with books in the basement; a .380 caliber Bryco was stored in a box in a closet upstairs. Both guns either were loaded or had loaded magazines nearby. We review the district court's finding of a relationship between the weapons and the drug offense for clear error. *United States v. Perez*, 581 F.3d 539, 546 (7th Cir. 2009).

Mr. Thurman maintains that the court's consideration of acquitted conduct violates his Sixth Amendment right to be tried by a jury. He acknowledges the Supreme Court's opinion in *United States v. Watts*, which allows a sentencing court to consider conduct of which a defendant was acquitted at trial if the Government can prove that conduct by a preponderance of the evidence. 519 U.S. 148, 157 (1997) (per curiam). Nevertheless, he insists that "*Watts* is teetering on the brink of being overruled"[16] based on the Court's subsequent decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005).

Mr. Thurman's position clearly is foreclosed by the Supreme Court's opinions and our circuit precedent. In *Watts*, the Supreme Court upheld a district court's application of the firearms enhancement at issue here despite the jury's acquittal on the same firearms charge that Mr. Thurman faced. The Court explained that its decision did "not punish a defendant for crimes of which he was not convicted, but rather increase[d] his sentence because of the manner in which he committed the crime of conviction." *Watts*, 519 U.S. at 154.

---

[16] Appellant's Br. 37.

Although the Court's due process and Sixth Amendment jurisprudence has evolved by way of *Apprendi*, *Blakely*, and *Booker*, it has not overruled *Watts*. *See United States v. Waltower*, 643 F.3d 572, 576 (7th Cir. 2011) (noting that "*Booker* itself suggests that *Watts* is still good law"). Accordingly, we have rejected challenges based on this line of cases and reiterate that "[i]f *Watts* is infirm, it must be based on a more direct attack—not *Apprendi* and its progeny." *Id.* at 577. Because we are bound by *Watts*, we must reject Mr. Thurman's Sixth Amendment challenge.

Mr. Thurman next contends that even within the framework of *Watts*, the court erred in finding that he possessed a dangerous weapon under U.S.S.G. § 2D1.1(b)(1).[17] He emphasizes that the two handguns were not within the immediate vicinity of his drug operations, such that he did not exercise control over them for purposes of constructive possession. He also notes that he procured the guns many years earlier for reasons unrelated to drug sales. According to Mr. Thurman, this shows the inapplicability of the enhancement, which is meant to account for "the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1(b)(1) cmt. n.11.

Application note 11 for U.S.S.G. § 2D1.1 lays out the relevant framework. It provides that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id*. We have construed this provision as imposing a twofold burden.

---

[17] Section 2D1.1(b)(1) instructs courts to increase the base offense level by two "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1).

First, the Government must prove by a preponderance of the evidence that the defendant possessed a weapon either actually or constructively, meaning he "had the power and the intention to exercise dominion or control of the firearm." *United States v. Morris*, 836 F.3d 868, 872 (7th Cir. 2016) (quoting *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005)). If the Government satisfies this burden, then the defendant must show that it is "clearly improbable [that] he possessed the weapon in connection with the drug offense." *Id.*

Based on our case law, it is clear that the Government satisfied its burden. We have stated repeatedly that "guns found in close proximity to drug activity are presumptively connected to that activity." *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) (quoting *United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003)). "This includes proximity to drug paraphernalia, such as a scale." *United States v. Rea*, 621 F.3d 595, 606 (7th Cir. 2010). In *Rea*, the defendant was convicted of conspiring to distribute methamphetamine, and the district court applied the § 2D1.1(b)(1) enhancement based on three firearms discovered in the defendant's house: one in the hall closet and two in separate bedrooms. The authorities also found a large amount of cash in the living room and a scale in the bathroom; however, they did not find any drugs in the house. *Id.* at 606. We held that the Government met its burden based on the proximity of the weapons to the drug paraphernalia along with the defendant's admission that he dealt methamphetamine in large quantities. *Id.* at 607; *see also United States v. Are*, 590 F.3d 499, 527–28 (7th Cir. 2009) (upholding application of firearms enhancement when guns were found in a safe with $20,000 of apparent drug money in the home of a large-scale cocaine dealer); *United States v. Smith*, 308 F.3d 726, 746 (7th Cir. 2002) (affirming application

of enhancement when guns were discovered in the defendant's home with $100,000 of likely drug money).

Our decisions in *Rea*, *Are,* and *Smith* demonstrate the futility of Mr. Thurman's argument. In order to establish constructive possession, the Government did not need to show that the guns were within his immediate reach. Both of Mr. Thurman's guns were kept in the house from which he distributed large quantities of heroin. One gun was kept in a closet, similar to the scenario in *Rea*, and the other gun was kept in close proximity to the safe where Mr. Thurman stored large amounts of ostensible drug money, much like the situation in *Are*. The hidden location of the latter gun in a packed trash bag does not undermine the district court's finding of constructive possession. *See Perez*, 581 F.3d at 547. Nor does the fact that the guns may not have been loaded. *Id.* (applying enhancement based on a gun discovered with ammunition in the same room). Regardless of whether Mr. Thurman initially procured the guns for reasons unrelated to his drug trade, their locations relative to his drug paraphernalia and admitted transactions sufficiently indicate their connection to his present offense. Therefore, the Government satisfied its burden of proving that Mr. Thurman constructively possessed the guns. Mr. Thurman then failed to meet his burden of showing that it is "clearly improbable" that he possessed the guns in connection with the drug offense. Indeed, when questioned by authorities, Mr. Thurman admitted that he had both guns to protect his drug trade. There is no doubt that he failed to meet his burden. Accordingly, the district court did not commit clear error in applying the firearms enhancement.

**Conclusion**

The district court properly denied Mr. Thurman's motions to suppress. The court's decision rests on its finding that the agents were credible. It was entitled to make that finding. The record before us supports the conclusions that Mr. Thurman voluntarily waived his *Miranda* rights and voluntarily consented to the search of his cell phone, including the forensic examination.

Mr. Thurman's challenges to his sentence also must fail. All of his arguments rely on a misconception of the district court's sentencing prerogative. The court was entitled to consider evidence proven by a preponderance of the evidence, and the record adequately supports its findings. Accordingly, the judgment is affirmed.

AFFIRMED