**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 10, 2019
Decided July 17, 2019

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 18-3714

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Illinois, Western Division. |
| *v.* | No. 16 CR 50004 |
| DARRIEN SPATES, *Defendant-Appellant.* | Philip G. Reinhard, *Judge.* |

**O R D E R**

Darrien Spates conditionally pleaded guilty to possessing a firearm as a felon, 18 U.S.C. § 922(g), preserving his right to appeal the denial of his motion to suppress a gun that officers found during a search of his girlfriend's apartment. Because Spates's girlfriend consented to the search, and the district court decided that her consent was neither coerced nor tainted by officers' earlier entry into the apartment, the court denied Spates's motion. We see no clear error in the court's assessment and therefore affirm the judgment.

# I. Background

Around 9:30 p.m. on November 3, 2015, Officer Erdal Kaya and his partner responded to a 911 call reporting a shot fired in the upper floor of an apartment building. When the officers knocked on the door of the second-floor apartment, Spates walked out onto the porch. The officers recognized Spates and knew he had an outstanding arrest warrant, so Kaya promptly took him into custody. Spates cooperated with the arrest and, when asked if anyone else was in the apartment, informed the officers that a six-year-old child was alone sleeping inside. Kaya patted Spates down and discovered a spent shell casing in his front pocket before bringing him downstairs and placing him inside a squad car.

Meanwhile Sergeant Duane Johnson arrived on the scene and led two officers in a sweep of the apartment. Over the course of a one-to-two-minute walkthrough, they called out the child's name and glanced in closets but did not open any containers or disturb any items. During the search, they noticed what appeared to be drugs but did not see a firearm. Eventually, they located the child sleeping under a blanket in the living room. Johnson woke the child and brought him outside to his mother and Spates's girlfriend, Jennifer McKinney, who was talking with Officer Kaya.

McKinney had been next door with a neighbor but walked outside when the neighbor told her that police were shouting her son's name. From her vantage point on the ground floor, she could not see the officers entering her apartment, only officers going up and down the stairs to the rear entrance. Once Officer Johnson had come downstairs and reunited McKinney with her son, Officer Kaya began preparing a written consent-to-search form for McKinney to sign. Kaya believes he explained the form's contents to McKinney, but in court McKinney could not recall that conversation. Regardless, she immediately signed the form without reading it and wrote in the time that she did so—9:38 p.m. McKinney testified that the entire conversation lasted thirty minutes to an hour and had started shortly after 9:00 p.m., but the officers estimated that it lasted less than fifteen minutes and had started around 9:30.

Before the district court, McKinney testified she had not been reluctant to sign the form, but she said she consented because the officers "made it sound like it would be in [her] best interest." She testified one of the officers had said he would call the Illinois Department of Children and Family Services because of the reported gunshot and that her refusing consent "would be incriminating." McKinney was frightened to learn that there was a gun in her apartment and that DCFS might take away her son because of it; she believed that if she did not sign the form she would look guilty.

Without the officers' statements, she says, she probably would not have signed the consent form. Nevertheless, she readily admitted that she knew of her right to refuse consent and that she had made an informed decision to sign anyway.

Officer Kaya, who could not recall the encounter's specific details and testified about his normal procedure in such a circumstance, did not remember discussing DCFS with McKinney at all. Typically, however, he would inform parents that he was a mandatory reporter and thus was required to notify DCFS about situations in which a child was possibly endangered. But he testified he would not ordinarily tell someone she would suffer consequences unless she did something. Officer Johnson, who had been nearby during Kaya and McKinney's conversation but did not participate in it at length, likewise recounted that Kaya had not mentioned DCFS. Nor had he heard any other officer insinuate that McKinney would look guilty if she refused consent.

Once McKinney signed the consent form, officers searched her apartment. After about an hour, they located a firearm hidden behind a pair of boots in a closet.

Spates was charged with unlawfully possessing the firearm and moved to suppress the gun on the basis that McKinney's consent was involuntary. He argued the officers' initial entry into the apartment and threats to call DCFS coerced McKinney into signing the consent form. The government maintained McKinney's consent was voluntary and the initial entry was a valid protective sweep. After an evidentiary hearing on these issues, the district court asked for additional briefing on whether exigent circumstances justified the initial sweep of the apartment.

The district court denied the motion to suppress. The court first concluded that the officer's first entry into the apartment was justified both as a protective sweep incident to Spates's arrest, and based on the exigent circumstance of the child left unattended in an apartment that likely contained a gun. The court determined that, in any event, the sweep had not tainted McKinney's consent because she was not aware of it. Finally, the court credited the officers' testimony over McKinney's for the few points on which they conflicted. The court found that McKinney's conversation with the officers had been short and that they had simply informed McKinney that they were mandatory reporters without threatening to take her child away. Under the totality of the circumstances, therefore, the district court found that McKinney's consent was voluntarily given. Spates pleaded guilty, was sentenced to 57 months' imprisonment, and now appeals.

## II. Analysis

On appeal from the denial of a motion to suppress, we review legal conclusions de novo and defer to the district court's factual findings and credibility determinations unless they are clearly erroneous. *United States v. Bell*, 925 F.3d 362, 369 (7th Cir. 2019). Because the firearm was not found during the initial sweep of the house, but only after McKinney consented to a complete search, the sole issue on appeal is whether her consent was voluntarily given. That question depends on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir.), *cert. denied*, 139 S. Ct. 278 (2018).

As an initial matter, the district court correctly recognized and considered the factors typically used to assess voluntariness—McKinney's age, intelligence, education, whether she was advised of her rights, the extent and duration of any custody or physical coercion, and whether the consent was immediately given. *See Schneckloth*, 414 U.S. at 226; *United States v. Correa*, 908 F.3d 208, 222 (7th Cir. 2018). The court correctly found these factors all weigh in the government's favor. McKinney is an adult with a high-school education and, so far as the record shows, ordinary intellect. Neither she nor her son was in custody or under any immediate threat of detention or physical force. She signed the written consent form immediately upon request, albeit without reading it. The district court further found that the entire conversation lasted less than 15 minutes. And though no witness could recall whether McKinney was told she could refuse consent, she herself testified that she knew of her right, which she also could have confirmed by reading the form.

Despite this evidence of voluntary action, Spates contends McKinney's consent was invalid. First, he argues the officers' statements to McKinney were coercive. But the district court permissibly credited the officers' testimony that they had made no threats, and all Spates offers to show clear error is that the officers admitted that their recall was imperfect. At oral argument on appeal, counsel highlighted that none of the officers remembered that they had taken McKinney to the police station that night. But McKinney similarly admitted her recollection was imperfect; and as counsel candidly acknowledged, she too forgot about her trip to the station. When a district court is presented with divergent accounts, neither of which is facially implausible, the court is entitled to make a credibility determination to which we will defer. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir.), *cert. denied*, 139 S. Ct. 278 (2018). We do so here.

Under the circumstances as the court found them to be, we cannot say McKinney's consent was involuntary. The officers' truthful statements that they were

mandated to report to DCFS were not coercive threats, and McKinney's "rightful concern for [her] family did not amount to psychological pressure," *United States v. Santiago*, 428 F.3d 699, 705 (7th Cir. 2005) (internal quotation marks omitted).

Spates also argues McKinney's consent was tainted by the earlier sweep, which he contends was an illegal search. But even if the sweep were illegal, there is no factual basis for Spates's argument. McKinney's own testimony contradicts the premise that the sweep influenced her decision to consent. She was not in the apartment at the time and she was not aware that officers had performed a sweep of the apartment. Instead, she inferred that officers had entered her apartment because they had retrieved her son. Though she knew that the officers believed that there was a gun in the apartment, she was never told that they had found a gun or even the drugs, and she disavowed knowledge of anything more than their "inclination that they thought there was a weapon." McKinney's understanding of the sweep was so limited that it could not have pressured her to consent, and she never testified that it did.

AFFIRMED