In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 21-3062

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAFAEL MERCADO BERRIOS,

*Defendant-Appellant.*

—————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 20-CR-30048 — **Sue E. Myerscough**, *Judge.*

—————————

ARGUED MAY 24, 2022 — DECIDED NOVEMBER 18, 2022

—————————

Before EASTERBROOK, WOOD, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Rafael Mercado used an Internet application to meet "Alexis," a profile operated by a trained FBI agent conducting an undercover investigation of adults with sexual interest in children. After a few minutes of texting, "Alexis" told Mercado she was 15 years old. For the next five days they texted, exchanged photos, and once spoke by phone.

Each day, Mercado initiated text conversations with "Alexis" in which he introduced explicit sexual content. He raised various sexual topics, and he described a series of sexual acts he wanted to engage in with her. Mercado also sent "Alexis" sexually graphic and suggestive messages and emojis, and he asked her to smoke marijuana and drink alcoholic beverages with him.

They arranged to meet at a house which turned out to be an FBI operations center. When Mercado arrived, he was arrested. After Mercado exhibited health problems, he was taken to a hospital and administered medication. Later, he was interviewed at the hospital, waived his *Miranda* rights, and made some inculpatory admissions.

Mercado was charged in a two-count indictment with attempted enticement of a minor in violation of 18 U.S.C. § 2422(b) and use of interstate facilities to attempt to transmit information about a minor in violation of 18 U.S.C. § 2425. He opposed a government motion to preclude an entrapment defense, but the district court ruled against him. That court also denied Mercado's motion to suppress his statements and evidence obtained in his hospital interview. A jury convicted him on both counts.

On appeal Mercado challenges the district court's rulings, arguing there was sufficient evidence to warrant an entrapment jury instruction. He also contends his suppression motion should not have been denied because he did not validly waive his *Miranda* rights. He further submits that his statements were involuntary as he was under the influence of drugs when he talked to the agents, and authorities coerced his statements. We disagree and affirm the district court's rulings.

## I. Background

### A. Investigation

These relevant facts come from the jury trial transcript and other district court records.

Rafael Mercado Berrios[1], who lived in Springfield, Illinois, had a profile on MeetMe, an Internet application often used by persons wanting to meet for casual sex. Online, Mercado was "Jose Mer." MeetMe requires users to be at least 18 years old, and in August 2020 Mercado was 41 years old.

FBI agent Matthew Carter, who was trained and certified to conduct online undercover investigations, used MeetMe to investigate adults with sexual interest in children. MeetMe was chosen, he testified, because the FBI had previously discovered child victims being exploited on that application. Carter created a profile of a girl named Alexis. To comply with MeetMe's age requirement, she was listed as 18 years old. The profile included a photo of a female confidential source who agreed to assist the FBI with its investigation. Although she is an adult, a filter was used to make her appear younger. Carter testified at trial that, through Alexis, he portrayed a naïve, inexperienced child, allowing the defendant to educate her on what he wanted.

During each of the next five days Mercado and Carter as Alexis exchanged numerous, and occasionally lengthy, text messages. They also swapped photos of themselves, mostly Mercado requesting pictures of Alexis. Carter kept a library of photos of the confidential source for this purpose. If

---

[1] The defendant prefers to use the last name "Mercado," a convention we adopt.

Mercado made a specific request of Alexis, such as to speak on the phone or for a particular pose in a picture, the confidential source remained with Carter at the FBI operations house to ensure that conversation could take place, or an image could be taken with current content, date, and time stamp.

The details of the interactions between Mercado and Carter as Alexis are important to Mercado's challenges to his convictions, so we review them now.

*Monday, August 24, 2020.* Mercado initiated a MeetMe chat with Alexis at 4:39 p.m. In his initial contact Mercado asked for additional pictures. The conversation quickly moved off MeetMe to text messaging from their respective cell phones. Within the first four minutes, Alexis told Mercado that she was 15 years old ("almost 16"). Mercado acknowledged this, stating she was "young." Mercado then told Alexis she had "a great body" for "only being 16" and Alexis clarified that "I'm 15 and I hate school." Carter later testified that the authorities wanted to "get the age of the child out as soon as we can" so the person they are "communicating with knows that they're speaking with a child."

Carter as Alexis texted Mercado that she would soon be house sitting by herself. Mercado asked Alexis if she liked how he looked, which she said she did. He then asked if she liked "watching Netflix and chillin'," to which Alexis replied, "I'm looking for more than Netflix and chill." After Alexis again said she was "looking for more than that" because she seldom had the house to herself, Mercado wrote "Oh … I can do more than that if you want. What is your desire?" Alexis wrote that she was embarrassed because she had not "done very much." Mercado responded he could "help" with her inexperience because he was "all about fun." Mercado then

asked, "Are we talking about regular activities outdoors or indoors?" Alexis responded, "Guess it could be either." Mercado briefly discussed an array of non-sexual activities, like tennis and frisbee. Alexis wrote, "I don[']t think we are talking about the same type of fun." Mercado answered, "Ok good … I wasn[']t sure. If you meant fun fun or just fun. So … I love to eat you know what." Mercado continued, "I also have done many positions." Alexis answered, "I have never had that before" Mercado continued "And licking and caressing. … Especially how I do it. I really enjoy it." Mercado continued, "I can also play some domination" and "It feels really good. If done right. And u can have multiple you know whats."

In response, Alexis asked Mercado, "Why are u talking like that." Mercado answered, "Just being careful." Alexis: "What do u mean." Mercado explained: "Your age. … You have heard of people getting in trouble right?" and "Didn[']t want to say the words. Unless you want me to. You give me consent?" Alexis responded, "Yes defin[i]tely."

Mercado then continued the text conversation and graphically described a series of sexual acts and sexual positions that he wished to engage in with Alexis. He also asked for a photo of her genitalia. Mercado continued his graphic sexual commentary, including how many times he would engage in sexual acts with her. Mercado confirmed that they could meet that weekend, which he reiterated in each of their text conversations over the next four days. After Mercado asked Alexis if she "actually had sex?" Alexis responded "I'm [] a virgin. I know that's embarrassing." Mercado continued his graphic sexual commentary, weaving in references to virginity.

Their conversation continued until Alexis told Mercado that she needed to run errands. He told her to reach out when she wanted to talk more. After a two-hour break, Carter as Alexis texted Mercado and they resumed their conversation until 10:46 p.m. that night. Mercado tried to contact Alexis five more times that night without a response.

*Tuesday, August 25, 2020.* The next morning Mercado initiated another text conversation with Alexis. He requested another photo, which Carter as Alexis sent. Mercado then sent her a sexually suggestive emoji and texted how he could not "wait to pass [his] hands on [her] smooth skin." They discussed the logistics of their planned meetup. Mercado said he would "bring some goodies," such as drinks, marijuana, candles, and a blindfold.

During this text conversation, Mercado again made several explicit sexual references. Mercado sent Alexis two GIFs—graphical interchange format, a series of images in continuous loop—including of a woman having an orgasm. He also said there were perks to being "dominant" and "submissive." Mercado asked Alexis for an email address, which Carter sent to him. Mercado also asked to speak by phone with Alexis the next day.

*Wednesday, August 26, 2020.* The following morning Mercado again initiated a text conversation with Alexis. He asked if she shaved "down there," which Carter took to mean her pubic hair. Mercado brought up spanking Alexis, asked what types of alcoholic beverages she liked, and wondered if she had ever gotten drunk. Mercado asked Alexis for another photo of herself in which she sent him a kiss, and Carter as Alexis complied. Mercado also established that Alexis had not used marijuana. When they met, Mercado asked her to drive

around with him while smoking marijuana and listening to music.

*Thursday, August 27, 2020.* Mercado again initiated a text conversation with Alexis the next morning He had gotten his haircut and sent "her" a picture of himself. Mercado asked Alexis for a picture licking or biting her lip, and Carter as Alexis complied. Mercado then raised the topic of Alexis's virginity and her sexual experiences. He described sexual acts he would perform on her, said how "your [sic] going to love it when I make you a wo[m]an," and how "[y]our [sic] going to want to do it many times and I will be able to."

Mercado then explained his schedule for the next day. After Mercado sent Alexis a series of GIFs and emojis, the second of which said "I wanna do bad things with you," Mercado spoke by telephone with the confidential source posing as Alexis. When asked on the witness stand why the phone call took place, Carter said that Mercado had requested it and the call provided "a certain type of realism" to the profile.

After the phone call, Mercado asked for another picture, which Carter as Alexis sent. Mercado said he was "not having sex with many women" and he asked Alexis if she wanted him to bring condoms. When Carter as Alexis said Mercado could bring sexual lubricant, he agreed to do so. Mercado asked whether Alexis's neighbors were nosy, and where he should park. He also asked for "her" address. Mercado then sent a series of emojis which read together were sexually suggestive. He and Alexis then exchanged photos and Mercado sent two more sexually suggestive GIFs.

*Friday, August 28, 2020.* On the day of the planned meeting, Mercado initiated a text conversation: "You are not baiting me

right? … You are not with law enforcement or affiliated to law enforcement right?" Carter as Alexis texted she was not and asked if Mercado was. Mercado texted: "Oh no baby … I am asking because of your age. I wanted to make sure. I have a good life and I don[']t want it all screwed up … just making sure."

Mercado told Alexis he was getting the alcoholic beverage White Claw, alluded to sexual lubricant, and said "I can't wait to get my arms around you." Later that day Mercado again asked Alexis for her address. Carter as Alexis texted Mercado the address of an FBI operations house in Springfield. Mercado drove to that address and arrived at approximately 5:50 p.m., where agents arrested him. On his person Mercado had the cell phone linked to the MeetMe account, as well as marijuana. In his car he had sexual lubricant and a case of White Claw.

*First Interview*. Law enforcement agents brought Mercado inside the operations house and into an interview room. The agents read Mercado his *Miranda* rights and he signed a form waiving those rights. After speaking briefly with the agents, Mercado asked for an attorney. The agents stopped their questioning, and when they told Mercado he was going to jail he started hyperventilating and pleading with them. The agents attempted to calm Mercado down, including by removing his handcuffs, but he passed out. The agents then called 911 and paramedics transported him to a nearby hospital.

At the hospital Mercado regained consciousness after a few minutes. The attending physician observed that Mercado "spontaneously recovered" and he began speaking quickly. Mercado said he was agitated because he suffered from post-

traumatic stress disorder and anxiety. The sedative lorazepam (Ativan) was administered, but it did not appear to affect Mercado. It turns out Mercado was already taking a similar drug, alprazolam (Xanax), which could have explained why his demeanor did not change. To the physician, Mercado remained conscious and alert. He spoke clearly and he did not show signs of intoxication. The physician believed Mercado may have been exaggerating his symptoms, so he arranged for Mercado to be returned to law enforcement.

*Second interview.* After Mercado had been at the hospital for more than three hours, and about 2 hours and 10 minutes after he received lorazepam, a detective escorting Mercado alerted the law enforcement agents from the first interview at the operations house that Mercado wanted to speak with them again. The agents went to the hospital and spoke with Detective Howard, who said Mercado "was alert, conscious, talking" and had been engaging in small talk.

The agents again read Mercado his *Miranda* rights, which they told him applied because he was in custody. Mercado began by asking "Will you let me go home" in a low volume, speaking slowly, and drawled out. He made eye contact with them, and his questions were appropriate. Based on the agents' experience, Mercado was not intoxicated.

Several times Mercado asked the agents about going home. Detective Howard told Mercado that she would ask her boss, and then she said, "so it's kind of depending on the outcome of – I don't know what you're going to say to me when I ask you questions, okay?" Mercado responded, "Even in custody it doesn't really mean I'm going to go straight to jail." One of the agents replied, "I don't know the answer to that, okay? And I don't know that because I don't know what

you're going to tell me, okay?" Mercado then said, "Ok, ok …
I'll start I guess."

Again, the agents advised Mercado that he had a right to
talk to a lawyer before answering any questions. Mercado
asked how that was possible. One of the agents explained that
an attorney could be assigned to him. After Mercado said he
understood he had the right to talk to an attorney and he
signed another waiver of his rights, the second interview pro-
ceeded.

Mercado admitted that Alexis told him she was 15 years
old. When one of the officers referred to her as "Alexa," Mer-
cado corrected the officer that her name was Alexis. Mercado
said he did not plan to have sex with her, and he offered mul-
tiple contradictory explanations for his actions. Then he said
he thought Alexis was a "bot" rather than a real person, that
he wanted to stop her from being assaulted by someone else,
and that the White Claw alcoholic beverages were for his
friends. Mercado also consented to a search of his phone, on
which agents located his text messages with Alexis.

**B. Procedural History**

Mercado was charged with attempted enticement of a mi-
nor in violation of 18 U.S.C. § 2422(b) and use of interstate
facilities to attempt to transmit information about a minor in
violation of 18 U.S.C. § 2425. He pleaded not guilty.

Before trial the government filed a motion about antici-
pated defenses and evidence. The motion included a request
to preclude an entrapment defense. Mercado opposed the
motion, and he proposed jury instructions on the elements of
entrapment which defined the terms "induce" and "predis-
posed." The district court granted the government's motion

and declined to instruct the jury on entrapment. In the district court's view, Mercado was predisposed to commit the offense; even if he was not, there was insufficient evidence of inducement to warrant an instruction on entrapment.

Mercado also moved to suppress his statements and evidence obtained during the second interview. He argued that he had unambiguously invoked his right to counsel, so any questioning should have stopped. His waiver of rights was also invalid, he said, because he was intoxicated when he spoke to the agents. The government opposed this motion.

At a hearing, the district court heard testimony from the two investigating agents who questioned Mercado and the emergency room physician who treated him. The court also received medical opinions about Mercado's condition at the hospital from physicians from both parties. In a lengthy opinion, the district court concluded that:

- Mercado did not unequivocally invoke his right to counsel during the second interview;

- under the totality of the circumstances, his *Miranda* waiver was knowing, intelligent, and voluntary;

- his statements during the second interview were voluntary; and

- his consent to search his electronic devices was knowing, intelligent, and voluntary.

So, the district court denied the suppression motion.

A three-day trial took place, at which Mercado did not ask to readdress the entrapment issue. A jury convicted Mercado on both counts, and he was sentenced to 120 months'

imprisonment. On appeal he challenges the district court's failure to instruct the jury on entrapment and the denial of his motion to suppress.

## II. Entrapment Jury Instruction

We review de novo Mercado's challenge to the district court's decision not to instruct the jury on entrapment. *United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011).

### A. Legal Framework

Entrapment "is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (en banc). In *Mayfield* this court comprehensively reviewed its case law on entrapment. *See United States v. Garcia*, 37 F.4th 1294, 1301–02 (7th Cir. 2022) (describing *Mayfield*'s rulings). Entrapment is an affirmative defense on which the government bears the burden of proof beyond a reasonable doubt. *Mayfield*, 771 F.3d at 439.

This court has adopted pattern criminal jury instructions on entrapment and its elements. THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, §§ 6.04 & 6.05 (2020 ed.). "[T]he defendant is entitled to a jury instruction on the defense 'whenever there is sufficient evidence from which a reasonable jury instruction could find entrapment.'" *Mayfield*, 771 F.3d at 440 (quoting *Mathews v. United States*, 485 U.S. 58, 62 (1988)). The two elements of entrapment—predisposition and inducement—though distinct from each other, are "conceptually related." *Id*. at 420, 430. "[T]o obtain a jury instruction and shift the burden of

disproving entrapment to the government, the defendant must proffer evidence on both elements of the defense. But this initial burden of production is not great. An entrapment instruction is warranted if the defendant proffers some evidence that the government induced him to commit the crime and he was not predisposed to commit it." *Id*. at 440. (citations omitted). "Put another way, '[a]lthough more than a scintilla of evidence of entrapment is needed before instruction on the defense becomes necessary, the defendant need only point to evidence in the record that would allow a rational jury to conclude that he was entrapped.'" *Id*. (citations omitted)

This court cautioned in *Mayfield* that "assessing 'sufficiency' in this context does not mean that the judge weighs the evidence or decides whether the defense is believable. '[W]here there is at least some evidence [of entrapment] in the record, it is for the jury … to weigh conflicting testimony, to draw reasonable inferences from the evidence[,] and to make credibility determinations." *Id*. (citations omitted)

*Mayfield* also addressed whether before trial the district court may preclude the defendant from asserting an entrapment defense. *Id*. at 440–41. "As a practical matter, entrapment is now regularly litigated as it was here: before trial, on the government's motion in limine to preclude the defense." *Id*. at 440. Although permissible, this court noted "an increased risk that the court will be tempted to balance the defendant's evidence against the government's, invading the province of the jury." *Id*. So, when ruling on a pretrial motion to preclude entrapment, the district court must accept as true the defendant's proffered evidence, and not weigh the government's evidence against it. *Id.*

The two elements, predisposition and inducement, also "are not equally amenable to resolution before trial," according to *Mayfield*. *Id.* at 441. Predisposition is a factual question, so it is hard to conclude "how a particular person could be deemed 'likely' to do something as a matter of law." *Id.* "The inducement inquiry, on the other hand, may be more appropriate for pretrial resolution; if the evidence shows that the government did nothing more than solicit the crime on standard terms, then the entrapment defense will be unavailable as a matter of law." *Id.* We consider the latter element next.

### B.  Government Inducement

"[I]nducement means more than mere government solicitation of the crime." *Mayfield*, 771 F.3d at 434. "Instead, inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id*. at 434–35. That conduct may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship." *Id*. Conduct "by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts" may qualify as inducement. *Id*. at 435.

As previously stated, when considering a pretrial motion to prohibit an entrapment defense, the district court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it. *Id.* at 440. The district court here satisfied that requirement. It only examined the evidence of inducement that Mercado pointed to—his text

conversations with Alexis—and it expressly avoided other evidence offered by the government.

The district court first considered whether comments by Carter as Alexis constituted solicitation, or more than that. The court reviewed the texts in detail. They included two comments by Carter as Alexis about "looking for more than Netflix and chill" and not thinking they were "talking about the same type of fun." To the district court, those two "comments were at most a mere solicitation for Defendant to commit the offense," and "no more than a mere invitation." The comments were "open-ended" and not inducement for which the entrapment defense was warranted. That Mercado "'relented,' if it can even be called that … based on nothing more than the[se] … open-ended comments" persuaded the district court that the government did not improperly induce Mercado to commit the crimes. [2]

Mercado sees government inducement in how his text conversations with Alexis unfolded. He contends Alexis was "the first person to suggest that he was interested in more than just watching Netflix and urg[ed] [him] to use sexually

---

[2] A few words about the legal standard for inducement that the district court referenced. Mercado argues the district court employed an improper standard by requiring that "extraordinary inducement" be shown. In *Mayfield*, this court considered the complication the term "extraordinary" had presented in decisions of the Supreme Court and this court, and "made a fresh start with a definition of inducement." 771 F.3d at 434. Here, the district court cited to and quoted from the correct standard of *Mayfield*, 771 F.3d at 434–35, and eventually concluded that the statements of "Alexis" constituted a "mere solicitation," which would not implicate the clarification of inducement in *Mayfield*. The district court's mention of the term "extraordinary" did not affect its ruling or implicate the reset of the law on inducement in *Mayfield*.

explicit language," and he characterizes the "Netflix" comment as "escalat[ing] the conversation." To Mercado, only when Carter as Alexis said they were "talking about a different kind of fun" did Mercado make sexual comments. He asserts Alexis "repeatedly tried to get [him] to engage in sexual conversation even when [he] was not doing so himself."

But Mercado's renditions of the text conversations are not accurate, as seen in their detailed recitation above. Mercado, not Alexis, introduced explicit sexual content into their text conversation, despite Alexis having stated multiple times that she was 15 years old. Mercado was the first to raise the topic of physical appearance, telling Alexis five minutes into their first conversation that she had a "great body for only being 16." Mercado seized on the ambiguous statement from Alexis about the type of fun they would have, and he repeatedly injected explicitly sexual content, either by asking about it or steering their conversations to it. The full transcript of the text conversations shows that shortly after Mercado's "open ended" comments, he was engaging in graphic sexual commentary with someone whom he had found out shortly before was (he thought) a 15-year-old girl. They show him repeatedly raising sexual topics, asking for photographs (such as of her genitalia and "biting her lip"), and sending sexual GIFs and emojis.

For support, Mercado points to *United States v. Pérez-Rodríguez*, 13 F.4th 1 (1st Cir. 2021), a First Circuit decision holding that a defendant presented sufficient evidence of inducement to justify an entrapment instruction. But that decision's facts differ from those here. In *Pérez-Rodríguez* the law-enforcement agent posed as an adult. The agent first discussed the prospect of sex with the defendant, before bringing

up the agent's minor boyfriend in the proposed sexual activity. *Id*. at 20–22. Because the defendant expressed interest in the agent—the adult, rather than the minor—the First Circuit held that a jury could conclude the defendant would not have attempted to entice a minor without the agent's encouragement. *Id*. at 22. Further, according to that court, in that context the government's "perverse statements that the minors would enjoy and benefit from sexual exploitation were important because such suggestions have the potential to influence the mind of a person who is not predisposed to abuse children and convince him that sex with a minor is acceptable." *Id*. at 27.

Here, Carter posed as a minor, and no adult was involved in whom Mercado would express interest. In the text exchanges between Mercado and Alexis there were no comments from anyone posing as an adult that suggested minors would benefit from sexual exploitation. Mercado was also the first to make explicit comments about sex. Thus, contrary to Mercado's suggestions, *Pérez-Rodríguez* is not persuasive.

One way inducement may be shown is if a defendant repeatedly declines persistent government pressure. *See Mayfield*, 771 F.3d at 420–21, 441 (entrapment instruction warranted when informant offered multiple opportunities over lengthy time period to engage in drug sales or robbery, and defendant agreed to commit crime only after informant implied harm if defendant did not repay loan). The text messages on Monday, August 24, 2020, do not show Mercado repeatedly declining escalating government pressure. Instead, he initiated their text conversations. In the first four minutes, Alexis told Mercado she was 15 years old, and seven minutes into their first interaction she had mentioned twice more that

she was underage. Mercado immediately stated that Alexis had a "great body." About 40 minutes into their texting, Mercado first sexualized the conversation, stating "So … I love to eat you know what" and "I also have done many positions." And only 16 minutes passed from Mercado's Netflix comment—a euphemism for casual sex—to Mercado raising and indirectly referencing oral sex and sexual positions.

We agree with the district court that these two comments by Carter as Alexis were no more than solicitations or invitations. Government solicitation of a crime does not constitute inducement for the purpose of an entrapment defense. *Mayfield*, 771 F.3d at 440.

Beyond these two comments by Carter as Alexis, Mercado points to what he believes are "plus" factors that qualify the government's conduct here as inducement. We consider each in turn.

*1. Age of the Confidential Source.* Mercado claims Carter "fraudulently misrepresented" the age of the FBI's confidential source depicted in the pictures Carter sent Mercado. The MeetMe profile used a picture of an adult female, but when Mercado sought further pictures of "Alexis," Carter sent pictures of an adult female that "he misrepresented as depicting a 15-year-old." To Mercado, this created a greater risk of entrapping an innocent suspect when it confused him by providing him with the picture of an adult.

This argument falls short because regardless of how "old" Alexis looked in the photo, Carter as Alexis told Mercado right away that she was only 15 years old. Associating a photograph of an adult with the Alexis profile did not present "a risk that a person who otherwise would not commit the crime

if left alone would do so in response to the government's efforts." *Mayfield*, 771 F.3d at 435. The photograph is not analogous to an improper inducement, such as a threat of violence or a personalized appeal to friendship. *Cf. id.* at 441 (holding that these tactics were sufficient evidence from which a reasonable jury could find inducement). The text conversation between Mercado and Alexis shows the defendant believed she was 15 years old. Mercado says to Alexis "Oh wow. Your [sic] young," and Carter as Alexis twice repeated her age. Mercado acknowledged her age and said it could present legal trouble for him.

Given that the age of Alexis did not deter Mercado, the photograph of a youthful-looking adult does not support the defendant's contention that but for the government's efforts, he would not have committed the crime of attempted enticement.

*2. Resuming the Text Conversation.* Mercado also argues that Carter as Alexis induced him to commit these crimes because during their first night of text messaging, after a two-hour pause, Alexis reached out and resumed the conversation.

Mercado's take on this sequence does not make it a "plus" factor. Carter as Alexis told Mercado that she needed to run errands. Mercado told her to reach out when she wanted to talk more. After a two-hour break, Alexis texted Mercado and they resumed their conversation until 10:46 p.m. This does not qualify as inducement, as Mercado invited Alexis to text him.

Further, as the government points out, Mercado tried to contact Alexis five more times that night without a response. Even more, Mercado initiated contact with Alexis each of the

next four days. The single occasion on which Carter actively resumed the text conversation, at Mercado's invitation, does not show inducement.

*3. Use of an Internet application that facilitates adult connections*. Mercado argues that Carter's use of an Internet application that facilitates adult connections to investigate individuals with a sexual interest in children amounted to inducement. We disagree. In agent Carter's experience, MeetMe is used for sex, not dating, as evidenced by its geographic location features. It is also commonly used to find children. Additionally, Mercado knew he was not pursuing an "adult connection" within minutes of talking to Alexis. The government's use of MeetMe is thus hardly "other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts," *Mayfield*, 771 F.3d at 434–35.

*4. Agent's enthusiasm for illicit sex*. Mercado also argues that "enthusiasm for illicit sex" by Carter as Alexis should be considered a potential "plus" factor. Mercado could be taking issue with how Carter phrased some of the text messages from Alexis, or with a couple of the pictures Mercado requested which Carter took of the confidential source posing as Alexis. But the focus is on the defendant's actions to determine whether an attempted enticement crime under 18 U.S.C. § 2422(b) has been committed, so any amenability of Alexis to Mercado's pursuit is not a "plus" factor to establish government inducement. Regardless, Mercado never develops this argument, so it is waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

Mercado also argues that even if any of these individual items did not amount to inducement, their cumulative effects

did, citing *United States v. Barta*, 776 F.3d 931 (7th Cir. 2015). *Barta* is far different, though, factually and procedurally, than this case. That decision involved an undercover government operation in which Barta and co-defendants agreed to bribe a fictional county official in California to obtain a government contract. *Id.* at 933. Undisputed evidence showed several "plus factors" signaling inducement, such as the government employing "fraudulent representations," "promises of reward beyond that inherent in the customary execution of the crime," and "pleas based on need, sympathy, or friendship." *Id.* This court concluded that the cumulative effects of these tactics directed at Barta amounted to inducement. *Id.*

The "plus" factors Mercado proposes do not hold up under scrutiny. Each falls comfortably within the scope of solicitation of the crime, and not more.

Mercado's case differs from those decisions in which a jury is to answer the factual question whether there was government inducement. For example, the facts here diverge markedly from those in *Mayfield*. There, the defendant was indicted for conspiring with a coworker and a drug courier to rob a stash house. The conspiracy was a setup, as the courier was an undercover government agent and the coworker an informant. 773 F.3d at 419. Mayfield sought to present an entrapment defense at trial. The government moved in limine to preclude the defense, arguing there was insufficient evidence that the government induced the crime or that Mayfield lacked the predisposition to commit it. *Id.* In response, Mayfield relayed a narrative that included exploitation of his acute financial need. *Id.* at 421, 441. Mayfield also described the informant's persistent campaign to involve him in the stash-house robbery, which Mayfield repeatedly resisted, as well as

the informant's thinly veiled threat of violence against May-field. *Id*. Based in part on the "substantial government induce-ment going beyond the mere offer of a chance to rob a stash house," *id*. at 420, this court vacated the judgment and re-manded the case for a new trial. *Id*. at 443.

Unlike the persistent informant in *Mayfield*, Mercado initiated the contact on the first day and every day thereafter. Mercado—not the informant, as in *Mayfield*—made the daily sexual overtures, which occurred over five days, rather than over many weeks. Mayfield capitulated due to financial pres-sures, while here Mercado took the lead throughout, continu-ously sexualizing a series of text conversations even though he knew within a few minutes that "Alexis" was underage.

*United States v. Blitch*, 773 F.3d 837, 840 (7th Cir. 2014), de-cided shortly after *Mayfield*, is instructive. There, a federal agent orchestrated an operation nearly identical to the one in *Mayfield*, yet we ruled that an entrapment instruction was not warranted. *Id.* In *Blitch*, as in *Mayfield*, the agent asked defend-ants to help him rob a fictional drug stash house. *Id.* All the defendants agreed, and law enforcement eventually arrested them at a planned staging area. *Id.* at 843. Pretrial, two of the defendants sought to present an entrapment defense. *Id.* at 840. The district court refused and granted the government's motion in *limine* to preclude that defense. *Id.* On appeal, this court affirmed the district court's decision and distinguished the case from *Mayfield*. *Id.* at 844–45. Unlike in *Mayfield*, where the government engaged in a drawn-out campaign of persua-sion, prayed on Mayfield's financial need, and impliedly threatened him, the *Blitch* operation featured no inducement. *Id.* at 845. The undercover agent framed the crime as "a take-it-or-leave-it proposition," and did "nothing more than make

a stash house robbery available." *Id.* Accordingly, this court held that there was no inducement. *Id.* The government actions here are closer to *Blitch* than to *Mayfield*. Agent Carter presented Mercado with an ordinary opportunity to act unlawfully towards a minor, which he accepted.

In *Mayfield* this court considered the fundamental principle in entrapment law that the government's offer of a run-of-the-mill opportunity to commit the charged crime is not entrapment and situated it on the inducement side of the analysis. *Id*. at 431–32. "Where the government's agents merely … solicit the crime, or furnish an opportunity to commit it on customary terms, the government has not 'induced' the crime within the meaning of the entrapment doctrine and the defense should be unavailable without the need for a more complex inquiry into evidence of predisposition." *Id*. at 432.

Sadly, these circumstances are "run-of-the-mill": Carter as Alexis furnished Mercado the chance to commit this crime on customary terms—a text conversation on a hook-up website followed by a meeting—and Mercado did so.[3] The only source Mercado points to of government inducement—the text conversations—do not provide any evidence that would allow a rational jury to conclude that the defendant was entrapped. In reaching this conclusion, the district court properly accepted the defendant's proffered evidence as true and did not weigh the government's evidence against it. *Mayfield*, 771 F.3d at 440.

Courts look for certain tactics to find inducement warranting a jury instruction on entrapment. Carter's actions as

---

[3] The law enforcement agents in this particular operation in Springfield arrested twelve men the same weekend as Mercado.

Alexis did not include any of the conduct prohibited as inducement, such as "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship." *Id*. at 434–35. Limited ambiguity in Mercado's early texts on Monday, August 24, 2020, does not provide him "some evidence" of government conduct that created a risk that a person who would not commit the crime if left to his own devices would do so in response to that conduct. None of these facts or inferences are "evidence in the record that would allow a rational jury to conclude he was entrapped." *Mayfield*, 771 F.3d at 440.

*        *        *

A defendant is required to proffer evidence on both elements of the entrapment defense, inducement and predisposition, to warrant an entrapment instruction. *Mayfield*, 771 F.3d at 440; *Pillado*, 656 F.3d at 764. "[W]here there is insufficient evidence of inducement—either because there is no such evidence at all, or because the government did nothing more than offer a standard market deal in a sting—there is no need to consider predisposition." *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012). Mercado did not present sufficient evidence to permit a reasonable jury to find that the government induced him to commit these crimes, *Mayfield*, 771 F.3d at 440, so the district court correctly denied his request for a jury instruction on entrapment.

### III. Suppression of Evidence

The district court denied Mercado's motion to suppress his statements during the second interview, which took place at the hospital.

"We review a district court's denial of a motion to suppress under a dual standard, assessing conclusions of law *de novo* and evaluating factual findings for clear error with special deference granted to the court's credibility determinations." *United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021) (citation omitted). Clear error exists only when "after considering all the evidence, we cannot avoid or ignore a definite and firm conviction that a mistake has been made." *United States v. Thurman*, 889 F.3d 356, 363 (7th Cir. 2018) (citation omitted). There are two separate inquiries: whether the defendant validly waived his *Miranda* rights, and whether his statements themselves were voluntary. *Outland*, 993 F.3d at 1021. The voluntariness of a statement is a question of law. *United States v. Villalpando*, 588 F.3d 1124, 1127 (7th Cir. 2009).

Mercado raises three challenges to this evidence. He argues his *Miranda* waiver was not valid, his statements were not voluntary, and the agents coerced his statements.

*Validity of* <u>*Miranda*</u> *waiver*. The government submits that Mercado has failed to preserve any argument that his waiver of *Miranda* rights was not valid by failing to raise that argument on appeal. Mercado did not respond to this contention.

Waiver, the intentional relinquishment or abandonment of a known right, precludes appellate review. *United States v. Wood*, 16 F.4th 529, 537 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1697 (2022). When a defendant "selects among arguments as a matter of strategy," he "waives those arguments he decided

not to present." *United States v. Mansfield*, 21 F.4th 946, 955 (7th Cir. 2021) (citation omitted). The government is correct. On appeal, Mercado has made a strategic decision to pursue arguments other than those about his waiver of *Miranda* rights, *see id.*, so he has waived this argument.

Even if Mercado had not done so, the district court correctly found that Mercado voluntarily signed a written waiver of his *Miranda* rights. To be voluntary, the government must show the defendant understood the rights he purported to waive. *Outland*, 993 F.3d at 1022. The voluntary nature of a waiver "is assessed based on the totality of circumstances," and it need only be shown by a preponderance of the evidence. *Thurman*, 889 F.3d at 364. Often, the court's ruling on whether a waiver of *Miranda* rights was voluntary will turn on the court's evaluation of the parties' credibility. *See id*.

Before the district court, Mercado pointed to his alleged intoxication as the reason he did not voluntarily waive his *Miranda* rights. As discussed below, the government presented evidence to rebut Mercado's contention that he was intoxicated so as to render his waiver of rights and subsequent statements involuntary. That court considered the totality of the circumstances, including the expert reports and the credibility of various witnesses. The district court concluded there was "no evidence that [Mercado] was intoxicated … there is not sufficient evidence that the administration of lorazepam to [Mercado] several hours earlier interfered with his capacity to make a knowing, intelligent, and voluntary waiver of his *Miranda* rights during the hospital interview."

That conclusion was based, in part, on the district court's evaluation of the credibility of Special Agent Roth (who conducted the hospital interview) and Dr. Regis (an emergency

room physician who treated Mercado at the hospital). The district court's finding—which credited the government's version of events, in which Mercado was not intoxicated or showing any signs of intoxication at the time he waived his *Miranda* rights—is not clearly erroneous and is entitled to deference. *See Thurman*, 889 F.3d at 363–64.

*Voluntariness of Mercado's statements*. Related to whether Mercado's waiver of his *Miranda* rights was valid is "whether, in the totality of circumstances, the defendant's statements to authorities were voluntary." *Outland*, 993 F.3d at 1021. Mercado has preserved a challenge to the voluntariness of his statements at the hospital to the law enforcement agents during the second interview. He claims he was too intoxicated to make voluntary statements. Mercado asserts that his decision to speak with the officers and his speech patterns were "consistent with the disinhibiting effects of lorazepam." He also contends he was under the influence of marijuana, which had a sedating effect. The government responds that Mercado fails to identify a clear error in the district court's factual findings on either of these points.

Accompanying Mercado's motion to suppress was the affidavit of the toxicologist Dr. Skolly, which focused on the administration of lorazepam to Mercado at the hospital. Dr. Skolly opined that Mercado's behavior was consistent with the disinhibiting effects of lorazepam and that as a result of the drug's effects, he was "incapable of thinking through the consequences of his actions." In response, the government filed the reports of Dr. O'Donnell (a Doctor of Pharmacy) and Dr. Killian (a board-certified psychiatrist).

According to Dr. O'Donnell, there was no evidence of Mercado being under the influence of lorazepam, as he spoke

clearly and responsively and did not slur his words during the second interview with law enforcement agents. Dr. O'Donnell also noted that Mercado was prescribed alprazolam, a drug similar to lorazepam (both are classified as benzodiazepines), but at least twice as potent. Similarly, Dr. Killian responded to Dr. Skolly's opinion by noting that Mercado "clearly demonstrated a more than adequate awareness of his situation, working hard to convince the officers that he was innocent and that his intentions were pure." Additionally, Dr. Killian agreed with Dr. O'Donnell that Mercado's "answers to the agents demonstrated understanding, deliberation, memory, recall[,] and persistence."

Though Dr. Killian did not dispute Dr. Skolly's statement that lorazepam may lead to a loss of restraint with respect to social behavior, per Dr. Killian "this effect would be seen only with very high doses." Dr. Killian rejected as wholly unsupported what he termed the "blanket statement" by Dr. Skolly that anyone using lorazepam could not think and reason appropriately. And Dr. Killian echoed Dr. O'Donnell's conclusion that there was no evidence Mercado was impaired by marijuana he had consumed earlier in the day, noting that Mercado's regular use of an ounce of marijuana per week likely caused him to develop a tolerance for it. According to Dr. Killian's assessment of Mercado's speech during the second interview with law-enforcement agents, "if there was any impairment whatsoever, it was very subtle and brief."

In this battle of experts, the district court did not commit clear error by relying on those opinion witnesses who testified that lorazepam did not render Mercado's statements involuntary. *See United States v. Wessel*, 2 F.4th 1043, 1055–56 (7th Cir.

2021) (holding it was not clear error to credit certain expert witnesses over others).

A similar analysis applies to Mercado's argument about the effects of marijuana. He relies on Dr. Skolly's report, which said it was "possible" that Mercado was under the influence of tetrahydrocannabinols, the active ingredient in marijuana, during the second interview. But the district court instead credited Dr. Killian's report, which opined that Mercado's regular use of marijuana likely caused him to adapt to any initial sedating effect of the drug. On this basis, the district court concluded that Mercado failed to present "sufficient evidence that the presence of THC in his system had any appreciable effect on whether [his] *Miranda* waiver was knowing, intelligent, and voluntary."

Finding facts, and assessing which accounts are consistent with those facts, is the province of the district court. *Outland*, 993 F.3d at 1023; *Thurman*, 889 F.3d at 364. After review, we are not left with the definite and firm conviction that the district court erred in finding that any slight degree of intoxication did not make Mercado's statements involuntary. The district court listened to the recording of the second interview and found that Mercado did not slur his speech and did not appear to be impaired. We conclude there was no clear error in this respect, and that Mercado showed no meaningful signs of intoxication while speaking with the agents. None of the evidence led the court to find that Mercado was sufficiently intoxicated to lack an understanding of his rights and render his statements involuntary.

*Statements and police coercion.* Last, Mercado argues that his statements during the second interview were the result of police coercion so the district court should have granted his

motion to suppress. According to Mercado, he was coerced when "law enforcement officials gave vague and misleading statements implying that [he] might be able to return home if he would just answer their questions." He concedes, though, that no "explicitly false promises" were made. The government responds that police tactics short of false promises are insufficient to overcome a defendant's free will.

The government has the better of this argument. We treat false promises differently than other deceptive police tactics because a false promise "has the unique potential to make a decision to speak irrational and the resulting confession unreliable." *Villalpando*, 588 F.3d at 1028. Other tactics, such as cajoling and duplicity, do not give rise to the same risks. *Id*.

Here, Detective Howard arguably implied there was a possibility that Mercado could go home rather than to jail, contingent on the answers Mercado provided. Of course, it was unlikely—though not necessarily impossible—that anything Mercado could have told law enforcement agents at that juncture would have resulted in his being released from custody. But, as Mercado concedes, the statement was not an "empty prosecutorial promise" that could have prevented him "from making a rational choice." *Id*. (citations omitted). Mercado tried to get the agents to promise that he could go home, but the agents did not agree. Under these circumstances, then, any pressure Mercado felt "did not rise to the level of coercion" for the statements to be involuntary. *Thurman*, 889 F.3d at 365. The district court therefore properly declined to suppress Mercado's statements as coerced.

Mercado requested that the agents from the first interview return to the hospital to interview him. Mercado signed a valid waiver of his *Miranda* rights, and the lorazepam or any

prior use of marijuana did not result in intoxication or affect the voluntariness of his statements. Neither were his statements the result of police coercion. Mercado's motion to suppress was thus properly denied.

## IV. Conclusion

Mercado has failed to point to "some evidence" that the government induced him to commit these crimes; it merely offered him the opportunity to do so. None of the inferences or facts he points to amount to "plus" factors. Because no reasonable jury could find otherwise, the district court did not err in declining to give a jury instruction on entrapment.

Mercado's suppression motion was properly denied because he executed a valid waiver of his *Miranda* rights. The voluntariness of his statements was not affected by the presence of any medications or drugs, and his statements were not the result of police coercion.

For these reasons we AFFIRM the district court's rulings.